In November 1998, H.D. Callaway, doing business as Callaway Associates (hereinafter "Callaway"), sued E.H. Smith Electrical Contractors, Inc. ("Smith Electrical"), and its chief executive officer, Linda DiAnn Smith ("Smith"), in the Circuit Court of Mobile County. Callaway's complaint alleged that Smith Electrical and Smith had failed to make payments that Callaway contended were due under a professional-services contract; Callaway also sought relief in quasi-contract. After a bench trial, the trial court entered a judgment in favor of the defendants; that court later denied Callaway's postjudgment motion, and Callaway appeals.
In his brief to this court, Callaway contends that the trial court's judgment is erroneous because, among other things, it failed to enforce unambiguous terms of a written agreement.
The record reveals that Callaway is an engineer who works as a "construction-contract-claims consultant" assisting contractors in itemizing, preparing, and presenting claims for payment arising from construction work. His background includes a civil engineering degree from Auburn University, service as a "construction claims negotiator" for the United States Army Corps of Engineers, and service as a "supervisory civil engineer" with the Naval Facilities Engineering Command. Since 1978, Callaway has been in the business of assisting contractors in the accounting, presentation, and negotiation of claims. He has authored or co-authored two books regarding construction and doing business with the government.
As a construction-contract-claims consultant, Callaway works with contractors experiencing problems or disputes with parties *Page 895 
with whom they have contracted. Part of his job is to analyze documents, contracts, and change orders; to talk to the people involved; to determine what the issues are; to distill the issues; to prepare a claim document; and to help the contractor negotiate settlement of those issues to the extent that they can be negotiated. When negotiations fail, Callaway assists in litigating the dispute as needed.
In April 1997, Callaway and Smith entered into negotiations concerning whether, and under what terms, Callaway would act on behalf of Smith Electrical in making various claims. On April 22, 1997, Callaway sent a letter to Smith, in her capacity as chief executive officer of Smith Electrical, referencing several numbered tasks, or "jobs," that had been undertaken by Smith Electrical in connection with the construction of an automobile plant near Vance, Alabama, but for which Smith Electrical had not been fully paid by the owner of the plant or its general contractor, Universal Construction Company ("Universal"). Callaway's letter incorporated several terms that had been proposed by Callaway in an earlier draft contract, along with a number of changes suggested by Smith; that letter, in pertinent part, stated:
 "I have reviewed the information provided to me on the following Job Numbers at the Mercedes Benz plant at Vance, Alabama: 1135, 1139, 1140 and 1144.
 "It is my understanding that the sum of these four contracts as modified to date is $2,802,255 and that you have been paid $2,505,182 to date, leaving a balance presently owed in the amount of $297,068 [sic]. I will assist you in the collection of this money for 5%.
 "It is my understanding that there are outstanding contract modifications on Job Numbers 1135, 1139 and 1140 totaling $423,063. I will assist you in the collection of these funds for a commission of 12%.
 "It is my understanding that the total direct cost to date on all four contracts is $3,386,650. There is some question in my mind if this number is inclusive of only Field Overhead and not Home Office GA expenses. Depending on whether or not the Home Office GA is included in the $3,386,650 or not, a total cost claim, if the issues support such, could yield a total cost claim in the range of [$500,000] to $1,150,000 above the proposed and outstanding unmodified change orders discussed above.
 "This would require significant further review of the job cost records and financial statement with your CPA. In any event, I will assist you in the pursuit of these claims to the extent I consider them compensable for a commission of 15%.
 "I will require a $2,000 retainer to be paid within 30 days. All commissions are due upon receipt of the funds from Universal or the Owner.
 "You had asked that I give you my opinion as to whether you could sue Universal in the event the parties could not resolve their differences. After a careful review of the subcontract documents provided, I find them silent on the issue of disputes.
 "To me this would mean that the parties could agree on whether to use arbitration, if mutually agreeable, or have access to the courts if one party dissented and wanted to go to court. Of course you should confirm this with a qualified legal opinion.
 "Any travel and/or other necessary expenses would be in addition to the previously discussed rates. If you agree with this proposal and wish for me to proceed, please sign in the space below indicating your agreement to retain my *Page 896 
 services based upon the above percentages and your agreement to pay the $2,000 retainer within 30 days."
Smith signed the letter as chief executive officer of Smith Electrical, and a signed copy was sent via facsimile to Smith Electrical by Callaway on April 27, 1997.
After the contract was executed, Smith Electrical sent Callaway a $2,000 retainer, and Callaway began working on Smith Electrical's claims. Initially, Callaway reviewed between 8 and 12 file drawers' worth of documentation regarding Smith Electrical's potential claims. In May 1997, he traveled to Huntsville to attend a meeting with Universal and Smith Electrical representatives at which Smith Electrical's right to additional funds was discussed, although representatives of Universal would not allow Callaway to speak at the meeting. At that meeting, Universal offered to settle Smith Electrical's claims for $219,745. However, that offer was rejected by Smith Electrical as being too low, and Callaway continued to work on preparing a final, comprehensive claim for all outstanding monies allegedly owed to Smith Electrical on the automobile-plant project. Callaway prepared five formal claim booklets on behalf of Smith Electrical, containing narrative summaries and other claim documentation, that were presented to Universal in a subsequent meeting between representatives of those entities in August 1997. At the August 1997 meeting, which Callaway and one of his employees attended, Universal increased its offer to $400,000; however, that offer was also refused by Smith Electrical, which insisted on a payment of $750,000.
After Universal's second compromise offer had been rejected, Smith Electrical retained legal counsel to represent it in its dispute with Universal. Callaway rendered assistance to Smith Electrical's counsel, including providing explanations of various documents, and counsel reviewed the claim documents in their preparation of a complaint on behalf of Smith Electrical against Universal. Callaway met with Smith Electrical's counsel on several occasions, both in their Mobile office and in Montgomery, where counsel for Smith Electrical and Universal's Atlanta-based counsel were meeting. Although counsel for Smith Electrical filed suit against Universal, that action was settled in November 1998 upon Universal's payment of $487,500 to Smith Electrical.
After Universal had paid Smith Electrical, Callaway billed Smith Electrical $34,564, which represented five percent of the $297,068 stated as being owed in the parties' contract plus 12 percent of sums above that amount. However, Smith Electrical did not pay Callaway's bill. In the trial court, Smith testified that she did not "contemplate having to pay a contingent fee if [Callaway] did not recover the money without the assistance of a lawyer."
To prevail on his breach-of-contract claim against Smith Electrical, Callaway was required to prove "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the [defendants'] nonperformance, and (4) damages."Southern Med. Health Sys. v. Vaughn, 669 So.2d 98, 99 (Ala. 1995). The trial court, as we have stated, entered a judgment in favor of the defendants. Although that judgment contained no express factual findings, we "will assume that the trial judge made those findings necessary to support the judgment." TransAmerica Commercial Fin. Corp.v. AmSouth Bank, 608 So.2d 375, 378 (Ala. 1992). Under the applicable standard of review, both "the trial court's judgment and all implicit findings necessary to support it carry a presumption of correctness and will not be reversed *Page 897 
unless found to be plainly and palpably wrong." TransAmerica,608 So.2d at 378. Therefore, we infer that the trial court found Callaway's proof lacking as to at least one element of his breach-of-contract claim against the defendants, and we must address whether that determination was "plainly and palpably wrong."
We first consider the first element, the existence of a valid contract binding "the parties." The April 22, 1997, letter that forms the basis of Callaway's contract claim is addressed to "Ms. Linda DiAnn Smith, CEO[,] E.H. Smith Electrical Contractors, Inc." Thus, the contract proposal as last presented by Callaway names Smith as an agent for Smith Electrical. Under Alabama law, "[a]n agent is presumed to intend to bind his principal only and to incur no personal liability and unless an intention to substitute or superadd his personal liability for or to that of his principal is clearly shown, he will not be bound in his individual capacity." Sealy v. McElroy, 288 Ala. 93, 104, 257 So.2d 340, 350
(1972). In this case, Smith testified that there were no discussions with Callaway regarding personal responsibility on her part for the payment obligations under the contract, and Callaway admitted that Callaway had acted in a representative capacity for Smith Electrical. We conclude that the trial court could properly have concluded that Smith was not personally bound by the contract at issue, although Smith Electrical was bound thereby. As a result, we conclude that the trial court's judgment is due to be affirmed insofar as it was in Smith's favor on the breach-of-contract claim, but must proceed to review the other elements of Callaway's breach-of-contract claim against Smith Electrical.
Could the trial court properly have determined that Callaway did not perform according to the terms of the contract? This is the principal issue disputed by the parties on appeal. Smith Electrical intimates that this question is to be answered in the affirmative — that Callaway is asking for an award of "contingency fees"[1] for services that he did not "successfully complete" because "[t]he contract expressly stated
that Callaway would only recover . . . if his services led to a settlement of claims" (first instance of emphasis added). Thus, Smith Electrical's premise is that the "performance" Callaway was due to render under the contract was the securing of a settlement from Universalsolely through his own efforts.
However, the contract that Callaway prepared after having consulted with Smith and that Smith signed on behalf of Smith Electrical does not contain any language that supports the position taken by Smith Electrical. Instead, the parties agreed that Callaway, in exchange for five percent of the $297,068 that the parties agreed was then due from Universal on the four specified job numbers plus 12 percent of the $423,063 allegedly due from Universal on several contract modifications, would "assist . . . in the collection" of those moneys. Simply put, the contract requires Callaway's "assistance" — it does not require Callaway to himself collect the subject funds from Universal, nor does it require that Callaway be the efficient cause of Smith Electrical's collection of those funds. "[C]ompensation may be due an agent who has accomplished a result leading to the final result, upon the happening of which the agent's compensation *Page 898 
is conditional." 2 Restatement (Second) of Agency § 448 comment b (1958). It is clear from the record that Callaway did perform services that amounted to "assistance" to Smith Electrical in its ongoing efforts to collect the disputed funds, including extensive document review, attendance at bilateral meetings, preparation of detailed claim statements that would later be used by Smith Electrical's counsel, and consultation with Smith's counsel before and after suit was filed against Universal seeking payment of the disputed moneys. Also, it is undisputed that Smith Electrical ultimately received funds from Universal that were contemplated in the parties' contract, which was the sole other contingency contemplated within the four corners of the contract. In the ordinary case, a principal "cannot make [an] agent's compensation dependent upon some contingency not contemplated by the agency contract." 3 C.J.S. Agency § 330 (1973); cf. Long-Lewis Hardware Co. v. Ewing,13 Ala. App. 435, 68 So. 794 (principal could not deny liability for commission due on sale of roofing material simply because specific material sold by agent was not then being manufactured), cert. denied,193 Ala. 678, 69 So. 1018 (1915).
As we have noted, Smith testified that she did not "contemplate" having to pay a contingent fee if Callaway did not recover the money without the assistance of a lawyer, and the trial court's judgment may be predicated on that testimony of Smith's subjective intent. However, as the Alabama Supreme Court stated in Acstar Insurance Co. v. American MechanicalContractors, Inc., 621 So.2d 1227 (Ala. 1993), "the law of contracts is premised upon objective rather than subjective manifestations of intent," and "a subjective intent on the part of the actor will not alter the relationship or duties created by an otherwise objectively indicated intent." 621 So.2d at 1232 (citations and internal quotations omitted). While the parties may have had differing views as to what actions on the part of Callaway would cause his right to compensation to mature, the objective language of the contract required Callaway to "assist" Smith Electrical in collection of the disputed moneys.[2] Therefore, we conclude that an implicit finding in favor of Smith Electrical on the issue of Callaway's performance would be plainly and palpably wrong.
Similarly, there was no substantial evidence presented to contradict Callaway's proof as to the two remaining elements of his breach-of-contract claim. It was undisputed that Smith Electrical did not pay more than $2,000 to Callaway, although that amount was far less than even the five percent of the $297,068 stated for the amount that the parties agreed was due from Universal. Smith Electrical's failure to pay the sums due under the parties' contract constituted nonperformance of its contractual obligations, thereby causing Callaway to suffer damages. Thus, the record provides no basis to conclude that Callaway failed to prove either the defendant's nonperformance or damages resulting *Page 899 
therefrom. Accordingly, the trial court erred in entering a judgment in favor of Smith Electrical on the breach-of-contract claim.
However, we affirm the judgment in favor of the defendants on Callaway's quasi-contract claim. "[T]he existence of an express contract generally excludes an implied agreement relative to the same subject matter." Vardaman v. Florence City Bd. of Educ., 544 So.2d 962, 965
(Ala. 1989). As we have discussed, Smith Electrical and Callaway entered into a valid, binding contract concerning Callaway's provision of assistance in securing payment of disputed sums from Universal, and Callaway's argument as to this claim expressly assumes the unenforceability of that contract. Moreover, Callaway testified to having provided services on behalf of Smith Electrical, as opposed to Smith individually, from which testimony the trial court could have concluded that Smith should not be individually responsible for paying for Callaway's services. As to that claim, we conclude that the trial court's judgment was not in error.
In light of the facts and authorities discussed above, we affirm the trial court's judgment except as to Callaway's breach-of-contract claim against Smith Electrical. In that single respect, the trial court's judgment is reversed, and the cause is remanded for further proceedings.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
Yates, P.J., and Crawley, Thompson, and Pittman, JJ., concur.
[1] We note that the contingent nature of Callaway's right to compensation under the contract does not, in and of itself, render the contract violative of public policy. See generally Chandler v. LamarCounty Bd. of Educ., 528 So.2d 309, 311 (Ala. 1988).
[2] Furthermore, at the time they entered into their contract in April 1997, Smith asked Callaway for his opinion as to whether Universal could sue Smith Electrical if the parties were unable to resolve their differences. The parties' contract contains language discussing the possibility of involving an attorney if this became necessary. Callaway further responded by referring Smith to a Mobile attorney for an opinion in that regard. Thereafter, during the negotiations with Universal, Callaway continued to encourage Smith to obtain legal counsel to help with the dispute, and in this regard introduced Smith to a Birmingham attorney. The objective manifestations by the parties therefore were consistent with the "contemplation" that an attorney might have to be employed to complete, or further assist, the collection process.